682 A.2d 753

IN MATTER OF JOHN DOE AND ROE CORPORATION.

Superior Court of New Jersey
Law Division Atlantic County

Decided January 31, 1996.

*Angelo Bianchi* for petitioner.

*William Gicking, Thomas W. Goan, Jr.* and *Linda A. Rinaldi,* for respondent (Office of the Attorney General, State of New Jersey).

RICHARD J. WILLIAMS, A.J.S.C.

Petitioners John Doe and Roe Corporation, having been served with Investigative Interrogatories under New Jersey's RICO statute, *N.J.S.A.* 2C:41–1 to 41–6.2, come before the court to have the Interrogatories modified or set aside.

On July 27, 1995, the Attorney General's office served petitioners with Investigative Interrogatories pursuant to *N.J.S.A.* 2C:41–5. The Interrogatories directed petitioners to appear at the offices of the Division of Criminal Justice Organized Crime and Racketeering Bureau to furnish information demanded therein in connection with an investigation of the alleged "control and financing of Roe Corporation and its owner John Doe by Organized Crime." September 11, 1995, was designated as the return date for response to the Interrogatories, which date was thereafter extended by the Attorney General to September 18, 1995. The Interrogatories further indicated that compliance could be effected by delivery of all of the requested materials, prior to the return date, to a designated state police detective.

On September 12, 1995, petitioners initiated proceedings in Essex County, pursuant to *N.J.S.A.* 2C:41–5j, to modify or set

aside the Investigative Interrogatories. The next morning, on September 13, 1995, the Attorney General filed a Petition in Atlantic County, pursuant to *N.J.S.A.* 2C:41–5i, to Compel Answers to the Interrogatories. The files were sealed by the court in both counties.

On September 29, the court dismissed the Attorney General's Petition to Compel Answers as prematurely filed, based upon the pendency of petitioners' application in Essex County. Thereafter, on October 2, the proceedings were transferred to Atlantic County for disposition.

Petitioners assert a potpourri of arguments upon which their requests for relief are based. Some are asserted with greater clarity than others. As set forth in their brief, those arguments are as follows:

* "*N.J.S.A.* 2C:41–5 is unconstitutional";

* "They [Investigative Interrogatories] violate [Petitioners'] right to be free from unreasonable searches and seizures and they fail to establish any connection between [Roe Corporation's] records and the Attorney General's investigation";

* "They violate [petitioners'] right to due process of law";

* "They violate [petitioners'] right to be free from self-incrimination";

* "*N.J.S.A.* 2C:41–5 was not enacted to be used against targets of RICO investigations"; and

* "Most of the questions asked are so broad, overbearing and not capable of being fully answered, or not of a nature to lead to relevant discoverable matter, that they should be struck."

In addressing these arguments, an understanding of the history of our RICO statute is helpful.

On October 15, 1970, the United States Congress enacted the Racketeer Influenced and Corrupt Organizations (RICO) provisions of the Organized Crime Control Act as a weapon against the pervasive influence of organized crime. *See,* 18 *U.S.C.A.* §§ 1961 to 1968. RICO was predicated upon the realization that organized crime and its predatory practices in business ventures threatened the integrity of the American economy and the security of the public. *See, S.Rep.* No. 617, 91st Cong., 1st Sess., 76–79 (1969). The RICO Act enhanced efforts to combat the evils of organized crime through the creation of new criminal offenses in circumstances where businesses were acquired, controlled, or operated

through activities or funds originating from patterns of racketeering activity. *See,* 18 *U.S.C.A.* §§ 1961, 1962. In addition, it created new causes for civil relief and included provisions for private enforcement of civil RICO claims. *See,* 18 *U.S.C.A.* § 1964. It also created additional investigative tools in the form of investigative demands, 18 *U.S.C.A.* § 1968; and provided for sanctions in the form of forfeiture and treble damages. 18 *U.S.C.A.* § 1964.

In the decades following the federal enactment of RICO, many states have adopted RICO-type statutory schemes. *See, Ariz.Rev. Stat.Ann.* 13–2301 to 13–2316; *Cal.Penal Code* 186–186.8; *Colo. Rev.Stat.Ann.* 18–17–101 to 18–17–109; *Conn.Gen.Stat.Ann.* 53–393 to 53–403; *Del.Code Ann.* tit. 11, 1501–1511; *Fla.Stat.Ann.* 895.01–895.09; *Ga.Code Ann.* 16–14–1 to 16–14–15; *Haw.Rev.Stat.* 842–1 to 842–12; *Idaho Code* 18–7801 to 18–7805; *Ill.Rev.Stat.* ch. 56½, 1651–1660; *Ind.Code Ann.* 35–45–6–1 to 35–45–6–2; *La.Rev. Stat.Ann.* 15:1351–56; *Miss.Code Ann.* 97–43–1 to 97–43–11; *Nev. Rev.Stat.Ann.* 207.350–.520; *N.J.S.A.* 2C:41–1 to 2C:41–6.2; *N.M.Stat.Ann.* 30–42–1 to 30–42–6; *N.Y.Penal Law* 460.00–.80; *N.C.Gen.Stat.* 75D–1 to 75D–14; *N.D.Cent.Code* 12.1–06.1–01 to 12.1–06.1–08; *Ohio Rev.Code Ann.* 2923.31–.36; *Okla.Stat.Ann.* tit. 22, 1401–1419; *Or.Rev.Stat.* 166.715–.735; *Pa.Cons.Stat.Ann.* tit. 18, 911; *R.I.Gen.Laws* 7–15–1 to 7–15–11; *Tenn.Code Ann.* 39–12–201 to 39–12–210; *Utah Code Ann.* 76–10–1601 to 76–10–1609; *Wash.Rev.Code Ann.* 9A.82.001–.904; *Wis.Stat.Ann.* 946.80–.88.

New Jersey enacted a Racketeering section in 1981 as part of its Code of Criminal Justice. *L.*1981, c. 167 (codified at *N.J.S.A.* 2C:41–1 to 41–6.2.) The express legislative intent of New Jersey's RICO statute is set forth in section 2C:41–1.1, which provides:

The Legislature hereby finds and declares to be the public policy of this State, the following:

a. By enactment of the "Criminal Justice Act of 1970," *P.L.*1970, c. 74 (C. 52:17B–97 et seq.), the Legislature recognized that the existence of organized crime and organized crime type activities presents a serious threat to the political, social, and economic institutions of this State.

b. Despite the impressive gains of our law enforcement agencies, organized crime and similar activities in this State are still a highly sophisticated, diversified and

widespread activity that annually drains millions of dollars from the State's economy by unlawful conduct and the illegal use of force, fraud and corruption. In recent years, that organized crime and organized criminal activity has [sic] spread to the operation of otherwise legitimate businesses.

c. In order to safeguard the public interest, effective criminal and civil sanctions are needed to prevent, disrupt and eliminate the infiltration of organized crime type activities which are substantial in nature into the legitimate trade or commerce of this State. It is, therefore, in the public interest to provide that activity which is inimical to the general health, welfare and prosperity of the State and its inhabitants be made subject to strict civil and criminal sanctions.

Like its federal counterpart, the New Jersey RICO statute is premised on the need to address the influence of organized crime upon New Jersey businesses. One mechanism authorized in the Federal RICO statute to combat organized crime was the use of investigative demands. *See,* 18 *U.S.C.A.* § 1968. Like the federal RICO statute, the New Jersey RICO statute also provides for the issuance of investigative demands, referred to in this State as "Investigative Interrogatories." *N.J.S.A.* 2C:41–5a, provides:

Whenever the Attorney General determines that there exists a reasonable suspicion that any person or enterprise may have information or be in possession, custody, or control of any documentary materials relevant to an investigation under this chapter, or whenever the Attorney General believes it to be in the public interest that an investigation be made pursuant to this chapter, he may, prior to the institution of a civil or criminal proceeding thereon, issue in writing, and cause to be served upon the person, an investigative interrogatory requiring him to answer and produce materials for examination.

Pursuant to this section, the Attorney General served the Investigative Interrogatories herein, thereby giving rise to the application to modify or set aside now before this court.

In the first of their challenges to the Interrogatories, petitioners argue that the RICO statute is "unconstitutional" in that it impermissibly gives the Attorney General the power to act as both prosecutor and grand jury. Petitioners' general claim of unconstitutionality sounds in the nature of a separation of powers argument, although not precisely so stated.

Petitioners argue that because the Investigative Interrogatories require that the requested information be furnished directly to the Attorney General, the Attorney General is therefore given the

power to act as both prosecutor and grand jury. Petitioners cite *State v. Hilltop Private Nursing Home, Inc.*, 177 *N.J.Super.* 377, 426 *A.*2d 1041 (App.Div.1981), to support an assertion that the Attorney General does not possess and cannot exercise such investigative powers.

This reliance upon *Hilltop* is misplaced. In *Hilltop* the court recognized the independence of the grand jury as a public institution and reaffirmed the principle that a prosecutor did not have the inherent power to subpoena any individual to appear before the prosecutor's office and produce evidence. *Id.* at 389, 426 *A.*2d 1041 (citing *State v. Foy*, 146 *N.J.Super.* 378, 391, 369 *A.*2d 995 (Law Div.1976), *app. dism.* 153 *N.J.Super.* 503, 380 *A.*2d 301 (App.Div.1977); *United States v. Dionisio*, 410 *U.S.* 1, 93 *S.Ct.* 764, 35 *L.Ed.*2d 67 (1973)). The prosecutor could only issue a *subpoena duces tecum* returnable for a date on which a grand jury would actually be sitting, and although such a subpoena could allow for voluntary delivery of the requested materials directly to the prosecutor, it could not restrict the opportunity to present the materials directly to the grand jury if the witness so desired. *Hilltop* was premised, however, on the extent of powers inherent in the executive branch of government. It did not contemplate a situation involving an explicit grant of investigative powers to the Attorney General by the Legislature, such as in this case.

The use of interrogatories or investigative demands is not unusual. Such tools have long been used in the context of antitrust and securities matters. *See, N.J.S.A.* 56:9–9; 15 *U.S.C.A.* §§ 1312–1313 (antitrust civil investigative demands); 15 *U.S.C.A.* § 78u (SEC investigations). Investigative demands, like those in both the federal and New Jersey RICO statutes, enable the Attorney General to determine whether a racketeering violation has occurred and if civil or criminal proceedings should be instituted. That the Legislature may supplement the investigative power inherent in the Executive Branch is beyond question. *U.S. v. DeGrosa*, 405 *F.*2d 926 (3d Cir.), *cert. denied, Zudick v. U.S.*, 394 *U.S.* 973, 89 *S.Ct.* 1465, 22 *L.Ed.*2d 753 (1969); *Application of*

*Waterfront Commission of New York Harbor,* 32 *N.J.* 323, 160 *A.*2d 832 (1960); *Greenblatt v. New Jersey Bd. of Pharmacy,* 214 *N.J.Super.* 269, 518 *A.*2d 1116 (App.Div.1986). Petitioners' challenge on this basis is therefore without merit.

■ Petitioners next assert that because *N.J.S.A.* 2C:41–5 does not require a showing of probable cause before the Attorney General may serve Investigative Interrogatories, the statute is violative of the right to be free from unreasonable searches and seizures as guaranteed by the Fourth Amendment of the United States Constitution and Article I, paragraph 7 of the New Jersey Constitution.

■ Petitioners are correct in observing that nothing in the statute requires a showing of probable cause before interrogatories may be issued. However, such a standard is not required by either the United States or New Jersey Constitutions. In *Oklahoma Press Publishing Co. v. Walling,* 327 *U.S.* 186, 66 *S.Ct.* 494, 90 *L.Ed.* 614 (1946), the Court set out three conditions for the validity of an administrative subpoena. Under the *Oklahoma Press* standard, the administrative subpoena must be sought for a "lawfully authorized purpose," documents requested must be "relevant to the inquiry," and adequate specification of those documents must be provided. *Id.* at 209, 66 *S.Ct.* at 505–506. While the Court stated that an agency may not act arbitrarily or in excess of its statutory authority, it also emphasized that the inquiry need not be limited by "forecasts of the probable result of the investigation." *Id.* at 216, 66 *S.Ct.* at 509 (quoting *Blair v. United States,* 250 *U.S.* 273, 282, 39 *S.Ct.* 468, 471, 63 *L.Ed.* 979 (1919)). In *United States v. Morton Salt Co.,* 338 *U.S.* 632, 70 *S.Ct.* 357, 94 *L.Ed.* 401 (1950), the Court upheld the broad powers of administrative inquiry, expressly likening the proper scope of an administrative subpoena to the broad powers of inquiry possessed by the grand jury. Affirming this position, the Court in *United States v. Powell,* 379 *U.S.* 48, 85 *S.Ct.* 248, 13 *L.Ed.*2d 112 (1964), stated that an agency *need not show probable cause but only must demonstrate that its purpose is legitimate under stat-*

ute, that the inquiry is relevant to that purpose, and that the required administrative steps have been duly followed. As with grand jury subpoenas, an unreasonably broad or overly burdensome administrative demand may be set aside or modified, but the party challenging the demand bears the burden of proof. *FTC v. Texaco, Inc.*, 555 *F*.2d 862, 882 (D.C.Cir.1977). As such, with respect to the proper standard of judicial scrutiny, case law has essentially treated the grand jury subpoena and the civil investigative demand in a similar fashion.

New Jersey's RICO statute has done the same. The Legislature has expressly provided a standard to determine what information may be requested in an Investigative Interrogatory.

*N.J.S.A.* 2C:41–5c provides:

No interrogatory shall:

(1) Contain any requirement which would be held to be unreasonable if contained in a subpena duces tecum issued in aid of a Grand Jury investigation; or

(2) Require the production of any documentary evidence which would be otherwise privileged from disclosure if demanded by a subpena duces tecum issued in aid of a Grand Jury investigation.

The standard to be applied in a challenge to an Investigative Interrogatory issued under New Jersey's RICO statute is therefore the same as that applied to a *subpoena duces tecum* issued in aid of a grand jury investigation. Under Fourth Amendment analysis, a *subpoena duces tecum* is reasonable without probable cause if it is "sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome." *In re Addonizio*, 53 *N.J.* 107, 128, 248 *A*.2d 531 (1968) (quoting *See v. City of Seattle*, 387 *U.S.* 541, 544, 87 *S.Ct.* 1737, 1740, 18 *L.Ed*.2d 943, 947 (1967)); *see, Greenblatt supra*, 214 *N.J.Super.* at 275, 518 *A*.2d 1116. Petitioners' argument that the statute must require a showing of probable cause is simply not well founded.

Furthermore, the statute provides for a judicial hearing to independently evaluate an interrogatory request before any response need be provided. *N.J.S.A.* 2C:41–5j states:

At any time before the return date specified in the interrogatory, such person may file in the Superior Court a petition for an order modifying or setting aside the interrogatory. The time allowed for compliance of the interrogatory, in whole or in part as deemed proper and ordered by the court, shall not run during the pendency of such petition in the court. The petition shall specify each ground upon which the petitioner relies in seeking relief, and may be based upon any failure of the interrogatory to comply with the provisions of this section or upon any constitutional or other legal right or privilege of the petitioner. In such proceedings the Attorney General shall establish the existence of an investigation pursuant to this chapter and the nature and subject matter of the investigation.

■ Thus, under subsection (j), a party served with Investigative Interrogatories pursuant to the statute may obtain independent judicial review of the reasonableness of the demand prior to incurring any obligation to comply. *See, See v. Seattle, supra,* 387 *U.S.* at 544–545, 87 *S.Ct.* at 1739–1740, 18 *L.Ed.*2d at 947 (1967).

■ Petitioners' additional assertion that a "seizure" has occurred is also without merit. It is well established that although a subpoena to appear before a grand jury may be inconvenient or burdensome, it is not viewed as a seizure within the meaning of the Fourth Amendment. *In re Grand Jury Proceedings Harrisburg Grand Jury,* 658 *F.*2d 211, 213 (3d Cir.1981).

■ Petitioners next argue that the enforcement provisions of this section of the RICO statute violate their right to due process. They assert that *N.J.S.A.* 2C:41–5i, on its face, does not afford process equal to that given a witness subpoenaed to appear before a grand jury. Petitioners argue that the statute permits the Attorney General to obtain an order directing compliance with the Investigative Interrogatory, without first giving a targeted individual or corporation notice and an opportunity to be heard. *N.J.S.A.* 2C:41–5i provides as follows:

Whenever any person fails to comply with any investigative interrogatory duly served upon him under this section or whenever satisfactory copying or reproduction of any materials cannot be done and the person refuses to surrender that material, the Attorney General may file in the Superior Court a petition for an order for the enforcement of this section.

■ Due process is a dynamic concept whose "sense of fairness cannot be imprisoned in crystal." *Callen v. Sherman's, Inc.,* 92 *N.J.* 114, 134, 455 *A.*2d 1102 (1983). Notwithstanding the

flexible nature of due process, it is settled that "the guarantee requires, at the minimum, notice to the affected party combined with an effective opportunity to respond." *In re Promulgation of Guardianship Services Reg.*, 103 *N.J.* 619, 632, 512 *A.*2d 453 (1986) (citing *Cleveland Bd. of Education v. Loudermill*, 470 *U.S.* 532, 546, 105 *S.Ct.* 1487, 1495, 84 *L.Ed.*2d 494, 506 (1985)). In determining whether a constitutional defect exists within a statute, the court must preliminarily assume that the Legislature intended to act in a constitutional manner. *Right to Choose v. Byrne*, 91 *N.J.* 287, 311, 450 *A.*2d 925 (1982) (citing *State v. Profaci*, 56 *N.J.* 346, 349–350, 266 *A.*2d 579 (1970)). The court's duty is to save a statute if it is reasonably susceptible to a constitutional interpretation. *Id.*

When *N.J.S.A.* 2C:41–5 is read as a whole, there is no doubt that a person is never compelled to comply with Investigative Interrogatories under this statute without being afforded an opportunity for independent review. It is correct, that read in isolation, *N.J.S.A.* 2C:41–5 does not explicitly provide for notice to the recipient in the event the Attorney General petitions the court to compel compliance. However, the provisions of the Act must be read *in pari materia.* *N.J.S.A.* 2C:41–5j provides for the filing of a petition by a recipient of Investigative Interrogatories to modify or set aside the Interrogatories. Pursuant to the provisions of *N.J.S.A.* 2C:41–5j, this matter is, in fact, now before this court for review. Inclusion of this provision demonstrates the legislative sensitivity to due process rights. Where the Legislature has provided the recipient of Interrogatories with an opportunity to seek judicial modification or set aside of Interrogatories, it is inconceivable that it did not also intend that there be a right to notice and a hearing on a petition to compel compliance filed by the Attorney General.

When determining that a notice requirement is necessary to maintain the constitutionality of a statute, the court may read such a requirement into the statute. *See, Right to Choose v. Byrne, supra,* 91 *N.J.* at 311, 450 *A.*2d 925 (1982); *State v.*

*DeSantis,* 65 *N.J.* 462, 473, 323 *A.*2d 489 (1974). A fair reading of the Act as a whole compels the conclusion that the Legislature intended that notice be given by the Attorney General when filing a petition pursuant to *N.J.S.A.* 2C:41-5i. As such, the challenged section fully protects petitioners' constitutional right of due process.

 Petitioners next argue that a review of the legislative history indicates that *N.J.S.A.* 2C:41-5 was not intended to be used against targets of RICO investigations. Petitioners assert that since they are targets of the investigation, the State may not obtain information from them by way of the Investigative Interrogatory process. It is not clear to the court that the Attorney General has explicitly identified petitioners as targets of the investigation. The analysis of this issue will proceed, however, as if petitioners were such targets.

On October 30, 1980, the Assembly Judiciary, Law, Public Safety and Defense Committee conducted a hearing pursuant to its consideration of Assembly Bill 1079. To support their assertion that targets of an investigation were to be excluded from the provisions dealing with Investigative Interrogatories, petitioners rely upon certain selected statements made during that Committee hearing.

In response to a question from Assemblyman Herman about how the committee could protect against prosecutorial abuse, the Deputy Attorney General stated:

[W]ell, this section of the bill was designed in two parts, the first was *to give the Attorney General the power to gather evidence from, primarily, third parties,* individuals who may have knowledge of a particular activity that would fit into the government's overall idea of what happened. (emphasis added)

Petitioners point to this statement to assert that the legislation was directed toward third parties and not targets of an investigation. However, the statement does not indicate that the supporters of the legislation intended to exclude targets of an investigation from its provisions. The statement that the bill was designed to give the Attorney General power to gather evidence "primarily"

from third parties suggests that the proponents of the bill recognized that in some instances interrogatories would be directed to targets or potential targets and did not intend that the powers be used exclusively with respect to third parties.

When setting forth examples of other statutes with similar investigative devices, the Deputy Attorney General referred to New Jersey's Antitrust Act which, he indicated, was used to investigate garbage collectors in the state who combined to restrain trade. He stated:

> We used the investigative demand tool to go to people who purchased garbage services throughout the service [sic] by means of questionnaire. We asked them to respond as to who was providing the service, what price, how they went about choosing their collectors, whether or not the attempt to choose another collector was made and whether they [were] able to get the service.

Later, in response to a question about that specific investigation, he further responded:

> *We didn't send Interrogatories to any people we felt were targets of our Interrogatories.* These Interrogatories were primarily sent to people like yourselves who might have been part of the garbage industry and they have purchased services and had valuable information for us in order for us to pinpoint the particular targets or areas of concern. (emphasis added)

Petitioners point to this statement as further support for their argument that there was an intent to exclude targets from the statute. It is clear, however, that this statement about not sending interrogatories to targets was in direct response to a question about the use of interrogatories in a specific investigation and not a general statement about the intended scope of the legislation.

Finally, petitioners rely upon the following statement made by Governor's Counsel during the hearings: "It's not the targets we're targeting here."

This statement occurred in the context of a discussion concerning how safeguards could be provided in a situation where interrogatories were sent to a target of the investigation. The Public Defender argued that the only way to provide adequate safeguards would be to prevent the use of Investigative Interrogato-

ries directed at targets. In this context, Governor's Counsel's remarks can be seen as nothing more than a reiteration of the Deputy Attorney General's comments that the Investigative Interrogatories were to be used primarily for non-targets.

In seeking to provide adequate safeguards, the Committee thereafter disregarded the suggestion of limiting the Interrogatories to nontargets. Instead, the Committee focused on other means of procedural protection. Assemblyman Herman, the Committee Chair, stated:

> Maybe the answer here, while we are thinking of proposing amendments, maybe each questionnaire that is sent out ought to tell him that he has a right to counsel and ought to tell him, if he objects, he has a right to contest it under this particular section, as just one of the potential safeguards.

Upon reconvening after a Committee recess, the following colloquy occurred between the Deputy Attorney General and the Committee Chair:

> DEPUTY ATTORNEY GENERAL: You asked, also, for protection to the recipients of the Interrogatories and we propose adding another sub-paragraph under paragraph B, so that the Interrogatories shall contain an affirmative advice to the recipient that he may discuss these investigative demands with an attorney prior to returning it or making the material available for inspection, pursuant to subsection F. ... Also there is paragraph J, that he has the right to apply to the court prior to making any return of the preliminary reply.
>
> ASSEMBLYMAN HERMAN: Okay. That goes a long way in balancing our sense of fair play.

The function of the court in construing any statute is to give effect to the legislative intention and purpose. *State v. Valentin,* 208 *N.J.Super.* 536, 539, 506 *A.2d* 748 (App.Div.1986); *Raybestos–Manhattan, Inc. v. Glaser,* 144 *N.J.Super.* 152, 167, 365 *A.*2d 1 (Ch.Div.1976). In examining legislative intent, the court must first direct its inquiry to the actual language of the statute. *Schiavo v. John F. Kennedy Hosp.,* 258 *N.J.Super.* 380, 386, 609 *A.*2d 781 (App.Div.1992), *aff'd.,* 131 *N.J.* 400, 620 *A.*2d 1050 (1993). It is to be presumed that the legislative intent is expressed by the ordinary meaning of the words used, and if the statutory language is clear, it is not necessary to examine legislative history. *Licata v. U.S. Postal Service,* 33 *F.*3d 259, 261 (3rd Cir.1994); *Harris v. Harris,* 749 *F.*2d 1009, 1013 (3rd Cir.1984); *State v. Mortimer,* 135

*N.J.* 517, 532, 641 *A.*2d 257, *cert. denied,* —— *U.S.* ——, 115 *S.Ct.* 440, 130 *L.Ed.*2d 351 (1994). The court must therefore seek to ascertain the intention of the Legislature from the plain meaning of the statute and determine what sensible legislators would intend a court to do. *State v. Zahl,* 259 *N.J.Super.* 372, 375, 613 *A.*2d 508 (Law 1992); *Johns–Manville Products Corp. v. Dronebarger,* 211 *N.J.Super.* 520, 525, 511 *A.*2d 1304 (Law Div.1986).

*N.J.S.A.* 2C:41–5a expressly provides the Attorney General may serve Interrogatories on "any person or enterprise" that may have relevant information. The language used in the statute is specific and in no way does it distinguish between classes of persons or enterprises. Nothing on the face of the statute indicates an intent to exclude targets from its scope. Neither is the legislative history offered by petitioners persuasive that the Legislature intended to exclude targets of an investigation from the scope of the Investigative Interrogatory provisions. While the statements of the Deputy Attorney General and others suggest that the focus of the legislation may primarily have been directed to non-targets of an investigation, nothing in the transcript of the Committee proceeding suggests that the Legislature specifically intended to exclude target witnesses from ever receiving Investigative Interrogatories. That possibility was explicitly raised by the public defender in the legislative hearings and was not pursued by the Committee. If there were a clear legislative intent to limit Interrogatories to only non-targets, such express language could easily have been included in the statute.

Furthermore, the Investigative Interrogatories are subject to the same standards as a grand jury *subpoena duces tecum.* Within the context of the grand jury, both targets and non-targets are subject to subpoena. *See, State v. Sarcone,* 96 *N.J.Super.* 501, 233 *A.*2d 406 (Law Div.1967). Just as targets are not excluded from the grand jury, there is no reason to believe that they were intended to be excluded from the scope of *N.J.S.A.* 2C:41–5.

As a practical matter, it may sometimes be difficult, if not impossible, to determine when a non-target witness becomes a

■■■■

target. Such could occur at any point during the course of an investigation. For this reason, the statute provides safeguards directed towards the type of information sought, not the status of the person served. If Investigative Interrogatories are served upon a target of an investigation, there is nothing to suggest that the target may not assert all of the protections that would be available if he had been served with a grand jury subpoena in the same investigation.

■■■ Petitioners raise two additional issues, which will be addressed as required in further proceedings. First, petitioners assert that the Investigative Interrogatories herein are overbroad. They cite *N.J. Court Rule* 4:10–3 (*R.* 4:10–3), which authorizes the court to enter protective orders in civil proceedings. It is clear however, that that rule does not provide the standard applicable herein.

*N.J.S.A.* 2C:41–5c provides:

No interrogatory shall:

(1) Contain any requirement which would be held to be unreasonable if contained in a subpena duces tecum issued in aid of a Grand Jury investigation; or (2) Require the production of any documentary evidence which would be otherwise privileged from disclosure if demanded by a subpena duces tecum issued in aid of a Grand Jury investigation.

The standard to be applied to a claim that the Interrogatories are overbroad is the same standard that would be applied to the issuance of a grand jury subpoena. Such an analysis with respect to the Interrogatories herein will require further proceedings which will be scheduled by this court forthwith.

■■■ Petitioners next argue that, based upon their Fifth Amendment privilege against self-incrimination, as guaranteed to the states through the due process clause of the Fourteenth Amendment, they are not compelled to answer the Interrogatories. *See, Malloy v. Hogan,* 378 *U.S.* 1, 84 *S.Ct.* 1489, 12 *L.Ed.*2d 653 (1964).

■■■ The Fifth Amendment does not prohibit the State from asking questions. *In re Martin,* 90 *N.J.* 295, 331, 447 *A.*2d

1290 (1982). In response to such questions, one has the liberty either to waive the privilege by answering the incriminatory question or to assert the privilege and refuse to incriminate oneself. *State v. Toscano*, 13 *N.J.* 418, 423, 100 *A.2d* 170 (1953). Where the privilege is asserted, the Attorney General may challenge the validity of the privilege claim through application to the court. *In re Boyd*, 36 *N.J.* 285, 176 *A.2d* 793 (1962); *In re Boiardo*, 34 *N.J.* 599, 170 *A.2d* 816 (1961); *State v. DeCola*, 33 *N.J.* 335, 164 *A.2d* 729 (1960). Such a proceeding requires an analysis of each individual question eliciting a claim of privilege. The court cannot simply accept the witness's statement that the requested answer will tend to incriminate the witness. *In re Boiardo, supra*, 34 *N.J.* at 606, 170 *A.2d* 816. Rather, the witness must support his assertion of privilege by a statement to the court specifically indicating the nature of the incrimination which the witness fears. The witness must establish a legitimate basis for the fear of criminal prosecution. *DeCola, supra*, 33 *N.J.* at 350, 164 *A.2d* 729. If the witness is a target of the investigation, however, such witness need show no more than that fact in order to support his or her Fifth Amendment claim. *In re Addonizio*, 53 *N.J.* 107, 248 *A.2d* 531 (1968).

Resolution of this issue is premature. Petitioners have not yet responded to the Interrogatories, so it is not clear whether the privilege will actually be asserted with respect to some or all of the questions. If such were to happen, it is not certain that the Attorney General would necessarily challenge the claim of privilege in whole or in part. Furthermore, the privilege has not been held to apply to corporations. *United States v. White*, 322 *U.S.* 694, 698, 64 *S.Ct.* 1248, 1251, 88 *L.Ed.* 1542, 1546 (1944). Therefore, even if petitioner Doe were to assert a privilege on his behalf as an individual, it would appear that answers would nevertheless have to be provided by petitioner Roe Corporation.

The court will schedule further proceedings on petitioners' claims that the Interrogatories are overbroad and unduly burdensome. If additional proceedings are required with respect to a

Fifth Amendment claim of privilege, such will be scheduled as necessary. In all other respects, petitioners' application to modify or set aside the Interrogatories is denied.